## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------------X

LATISHA JOHNSON,

        Plaintiff,

  -against-

THE CITY OF NEW YORK, THE BRONX DISTRICT
ATTORNEY'S OFFICE, MANUEL D. ALAMO, "JOHN"
COAKLEY, MICHAEL DISKIN, "JOHN" MULLARKEY,
"JOHN" O'BRIAN, ANGELO POLITE, "JOHN" REILLY
JAMES C. RUANE, ANTHONY RUSSO  and
"JOHN" SCANLON, STEVE SMITH,

        Defendants.

-------------------------------------------------------------------------X

**AMENDED COMPLAINT**
15 CV 01812 (DLC)

**JURY TRIAL
DEMANDED**

      Plaintiff, **LATISHA JOHNSON** ("Plaintiff"), by her attorneys, CUOMO LLC,

complaining of the Defendants, respectfully alleges, upon information and belief,

as follows:

## NATURE OF THE ACTION

1.    This is a civil action, pursuant to 42 U.S.C. §1983 and §1988, and state

law seeking monetary damages for Plaintiff, LATISHA JOHNSON, due to her

false arrest, false imprisonment, malicious prosecution, wrongful and unjust

conviction, violation of her civil rights under the United States and New York

State Constitutions and her nearly seven year wrongful imprisonment caused

by the pervasive misconduct, deliberate indifference and a pattern of

unconstitutional behavior by subordinates of the Bronx District Attorney's Office

("BXDA") and the New York City Police Department ("NYPD") and their various

members, servants, employees, and agents

2.      Plaintiff's conviction for attempted murder, burglary, robbery, assault, criminal possession of a weapon was based primarily on the false and fallacious identifications obtained by the NYPD detectives and by their failure and refusal to properly and thoroughly investigate the case. The BXDA presented no physical evidence; no DNA evidence; and no fingerprint evidence at trial linking the Plaintiff to these crimes. The BXDA and the NYPD knew, should have known  or had reason to know that Plaintiff was innocent but ignored that knowledge and proceeded to try Plaintiff anyway.  .

3.      The victim, Mr. George Peseo, was actually attacked by Latreese Shufford and Jacqueline Misodi. Ms. Shufford and Ms. Misodi are currently on trial for those crimes at the writing of this amended complaint. Ms. Shufford and Ms. Misodi gave full confessions in January 2014 to the BXDA.

4.      Plaintiff's conviction by jury on June 11th, 2007 was overturned on January 16, 2014 by Justice Ethan Greenberg who ordered that the conviction be vacated and that Plaintiff be freed from prison. The application was joined by the BXDA based on the exculpatory evidence that had been uncovered subsequent to Plaintiff's conviction but which could have been and should have been uncovered during the course of the investigation and criminal proceedings in this matter. The indictment was ordered dismissed with prejudice on March 11, 2014.

5.      This lawsuit seeks to hold the defendant CITY OF NEW YORK and BXDA and their various members, servants, employees, and agents liable for the above misconduct under the federal civil rights statute, 42 U.S.C. §1983 et

seq.; New York State common law; and *Monell v. Dept. of Social Services*, 436 U.S. 658 (1978). The unlawful actions of police detectives prosecutors and other various members, servants, employees, and agents of NYPD and BXDA documented in this lawsuit resulted from affirmative practices and customs that resulted in violation of the constitutional rights of criminal suspects and defendants and Plaintiff in particular; and from deliberate indifference by policy-making officials, acting on behalf of the City of New York and the BXDA to such violations. As the Plaintiff will demonstrate, the NYPD coerced Plaintiff Latisha into giving a false and unreliable confession through their misuse of intimidation, duress, coercion, unreasonable deception, and their powers of arrest and interrogation. Furthermore, The BXDA knowing full well that Latisha's "confession" contained enough irregularities that they decided not to introduce it at trial, still wrongfully prosecuted her. Latisha would not have been convicted at all but for the police and the trial prosecutor's misconduct. This lawsuit seeks to hold liable the police detectives, as well as the City of New York and the BXDA pursuant to *Monell v Dept of Social Services*, 436 U.S. 658 (1978) because the deliberate indifference of the Bronx District Attorney, as policymaker for the City, was a substantial cause of the prosecutor's misconduct which in turn caused Latisha's constitutional injuries.

6.      Based on the egregious conduct by the aforementioned Defendants in the case, Latisha was arrested when she was 18 years old and spent nearly seven years incarcerated for a crime she didn't commit. She was labeled a violent felon and was wrongly held under prosecution for years prior to her wrongful

conviction. The resulting damages to Latisha are myriad and extraordinary. As one example, as a result of her wrongful arrest and conviction, Latisha's parental rights to her young son were terminated. Plaintiff therefore seeks to hold Defendants accountable for their reprehensible conduct and seeks compensation for the pain, suffering and loss caused by wrongfully spending nearly seven years behind bars.

## JURISDICTION

7.   This action is brought pursuant to 42 U.S.C. § 1983 and §1988, and under the common law of the State of New York.

8.   This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367.

9.   This Court also has jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

10.   Plaintiff has complied with the requirements of New York General Municipal Law Section 50-i by making and serving a notice of claim on the Comptroller of the City of New York within the time required by New York General Municipal Law Section 50-e. More than thirty days have elapsed since service of that notice, and no offer of settlement has been made.

11.   On March 5, 2015, Plaintiff submitted to a hearing pursuant to New York General Municipal Law Section 50-h. Plaintiff has met all conditions precedent to filing a complaint against the defendants.

## VENUE

12.     Venue is proper under §28 U.S.C. §1391(b). The events giving rise to the

claims asserted herein occurred in this judicial district and Defendant City of

New York is a municipal corporation located herein.

## THE PARTIES

13.     At all times relevant herein, Plaintiff has been a resident of the Bronx,

located in the City and State of New York.

14.     Defendant CITY OF NEW YORK, of which the County of the Bronx is a

subdivision, is a municipal corporation of the State of New York with its

principal headquarters in the City, county and State of New York. Defendant

Bronx District Attorney's Office ("BXDA") is a governmental agency authorized

to prosecute crimes occurring the County of Bronx, State of New York with its

principal headquarters located in Bronx County, New York.

15.     The New York City Police Department ("NYPD") is a mayoral agency of

the CITY OF NEW YORK. Detectives and Police Officers employed by the

NYPD are agents and employees of the City of New York, which is legally

responsible for torts they commit within the scope of their employment and/or

under color of law. The CITY OF NEW YORK is also obligated under law to

indemnify and defend the individual defendants named herein.

16.     Defendant DETECTIVE MANUEL D. ALAMO, at all relevant times, was a

detective employed by the NYPD, acted toward Plaintiff under color of the law,

statutes, ordinances, customs, and usage of the State of New York and the City

of New York, and acted within the scope of his employment. He is sued in his individual and his official capacities.

17.     Defendant DETECTIVE "JOHN" COAKLEY (actual first name unknown), at all relevant times, was a detective employed by the NYPD, acted toward Plaintiff under color of the law, statutes, ordinances, customs, and usage of the State of New York and the City of New York, and acted within the scope of his employment. He is sued in his individual and his official capacities.

18.     Defendant DETECTIVE MICHAEL DISKIN, at all relevant times, was a detective employed by the NYPD, acted toward Plaintiff under color of the law statutes, ordinances, customs, and usage of the State of New York and the City of New York, and acted within the scope of his employment. He is sued in his individual and his official capacities.

19.     Defendant DETECTIVE "JOHN" MULLARKEY (actual first name unknown), at all relevant times, was a detective employed by the NYPD, acted toward Plaintiff under color of the law statutes, ordinances, customs, and usage of the State of New York and the City of New York, and acted within the scope of his employment. He is sued in his individual and his official capacities.

20.     Defendant DETECTIVE "JOHN" O'BRIAN (actual first name unknown), at all relevant times, was a detective employed by the NYPD, acted toward Plaintiff under color of the law, statutes, ordinances, customs, and usage of the State of New York and the City of New York, and acted within the scope of his employment. He is sued in his individual and his official capacities.

21.     Defendant DETECTIVE ANGELO POLITE, at all relevant times, was a detective employed by the NYPD, acted toward Plaintiff under color of the law statutes, ordinances, customs, and usage of the State of New York and the City of New York, and acted within the scope of his employment. He is sued in his individual and his official capacities.

22.     Defendant DETECTIVE "JOHN" REILLY (actual first name unknown) at all relevant times, was a detective employed by the NYPD, acted toward Plaintiff under color of the law, statutes, ordinances, customs, and usage of the State of New York and the City of New York, and acted within the scope of his employment. He is sued in his individual and his official capacities.

23.     Defendant LIEUTENANT JAMES C. RUANE, at all relevant times, was a police officer employed by the NYPD, acted toward Plaintiff under color of the law, statutes, ordinances, customs, and usage of the State of New York and the City of New York, and acted within the scope of his employment. He is sued in his individual and his official capacities.

24.     Defendant SERGEANT ANTHONY RUSSO, at all relevant times, was a police officer employed by the NYPD, acted toward Plaintiff under color of the law statutes, ordinances, customs, and usage of the State of New York and the City of New York, and acted within the scope of his employment. He is sued in his individual and his official capacities.

25.     Defendant DETECTIVE "JOHN" SCANLON, at all relevant times, was a detective employed by the NYPD, acted toward Plaintiff under color of the law statutes, ordinances, customs, and usage of the State of New York and the City

of New York, and acted within the scope of his employment. He is sued in his individual and his official capacities.

26.     Defendant DETECTIVE STEVE SMITH, at all relevant times, was a detective employed by the NYPD, acted toward Plaintiff under color of the law statutes, ordinances, customs, and usage of the State of New York and the City of New York, and acted within the scope of his employment. He is sued in his individual and his official capacities.

## STATEMENT OF FACTS

### THE CRIME

27.     On September 6, 2005, in the early morning, George Peseo was the victim of a home invasion robbery at his apartment located in Bronx, New York.

28.     It was later determined that these crimes were committed by a group five men and two African-American women.

29.     Latreese Shufford and Jacqueline Misodi later confessed to being these two women. Shufford and Misodi were roughly sixteen years-old and working for their pimp, Jonathan Cassanova in a three-bedroom apartment in Harlem.

30.     Days before the September 6 robbery, Mr. Peseo had spent the weekend hanging out, drinking and having sex with Shufford and Misodi in exchange for money.

31.     On the evening of September 5, 2005 Shufford and Misodi demanded money from Mr. Peseo. Initially, Mr. Peseo refused. Finally, Mr. Peseo's friend, Frank Nti, who later came to the apartment, gave Shufford and Misodi some money for Mr. Peseo, then the girls left.

32.     Upon returning home to Harlem, Shufford and Misodi, along with five other
        men devised a plan to rob Mr. Peseo. Shufford and Misodi returned with the
        five men to Mr. Peseo's apartment at approximately 3 a.m. the morning of
        September 6 2015.

33.     Shufford and Misodi, along with their gang, beat Mr. Peseo, tied him up
        with duct tape, and raided the apartment looking for valuables. One of the men,
        Mr. Rowson, shot Mr. Peseo twice and left him in the closet. Shufford and
        Misodi used the car keys they stole from Mr. Peseo to find and steal his green
        Ford Expedition.

34.     Fortunately, Mr. Peseo survived and was able to escape from the closet
        and call for help. After a barrage of major and life-threatening surgeries, Mr.
        Peseo began to make a recovery.

35.     On September 5, 2015 while Mr. Peseo was patronizing Shufford and
        Misodi, Plaintiff, then-17 year old Latisha Johnson, was with her family,
        enjoying a Labor Day barbeque. The morning of the robbery, Latisha was
        staying at her boyfriend's apartment. She had no involvement in the crime and
        no connection to any of the perpetrators.

### THE INVESTIGATION

36.     Responding to the scene, Defendant Detectives, Alamo and Polite
        interviewed eyewitnesses who had seen and interacted with the real
        perpetrators. Two witnesses, who were standing outside the building during the
        assault reported that a group entered the building while a Hispanic man waited
        outside. They further reported that at one point a short (between 5'4"-5'5"), thin

woman came out to ask the Hispanic Male for a cigarette. This description did
not match Latisha nor her co-defendant, Malisha Blyden.

37.     Both witnesses also reported that the short skinny woman used the alarm
button to find a Ford Exhibition on the street which the Hispanic lookout drove
in front of the building. The witnesses saw the group load the car up with plastic
bags, a television and a computer. A few minutes after the group drove away in
the Ford, witnesses saw Mr. Peseo come out of the building asking for help
because he had been shot.

38.     At approximately 7:45 a.m. on the morning of September, 6 2005,
Detectives Smith and Scanlon went to Mr. Peseo's apartment to speak with
officers Alamo and Polite who initially responded to the 911 call and processed
the crime scene.

39.     Detectives Smith and Scanlon then went to the hospital to try and
interview Mr. Peseo regarding the incident. However, due to his current grave
medical condition he was not able to answer many questions except that he
owned a green Ford Expedition and that he knew who had shot him.

40.     Later that day, Detectives Smith, Diskin and Reilly interviewed Mr. Nti at
the 44th precinct in the Bronx. The Detectives learned from Mr. Nti that he had
met two African-American girls at Mr. Peseo's apartment the afternoon before
the shooting and that he knew the two girls had a connection to the Polo
Grounds Housing Project in Harlem. He also told the Dectectives that he had
witnessed an argument between the two girls and Peseo in the apartment that

night and that one of the girls had used Peseo's cell phone to call an unknown male.

41.     Mr. Nti was asked to view photos from the New York City Police Photo Manager System but was unable to identify anyone.

42.     That evening, Detectives Smith and Reilly canvassed the area around the Polo Grounds housing project in Harlem with Mr. Nti. They found Mr. Peseo's Green Ford Expedition parked on West 155th Street between Frederick Douglas Blvd. and Harlem River Drive.

43.     Later that evening Detectives Smith and Scanlon spoke with Elizabeth Mendez, a friend of Mr. Peseo's who corroborated everything Mr. Nti had already told the police.

44.     During the following days, Detective Smith kept hitting dead ends in the investigation and Mr. Peseo was still in the hospital unable to be interviewed due to his medical condition. It wasn't until September 19' 2005 that Smith was able to interview Mr. Peseo. Mr. Peseo confirmed everything the police had learned from the other witnesses: that Mr. Peseo had picked up two African-American girls at the Polo Ground housing project in Harlem and drove them back to his apartment in the Bronx. While he was with the girls he had let them use his cell phone to make calls.

45.     A couple of days after interviewing Mr. Peseo, Detective Smith received call records from both Mr. Peseo and Mr. Nti. When he examined the phone records he noticed that on September 6, 2005 after 5:00am phone calls to three different numbers had been made. Mr. Peseo could not have made these calls

as he was already undergoing surgery. Smith then requested the subscriber information and caller identification detail for all three numbers.

46.     Before he received the subscriber information for the three numbers, Smith returned to the hospital to interview the heavily medicated Mr. Peseo. Mr. Peseo pointed out two numbers he did not recognize which were dialed from his phone before the assault. Smith proceeded to conduct a reverse phone lookup on these two numbers. One of the numbers was a landline which was registered to a Mr. Tyrone Johnson in Harlem. Mr. Johnson is the father of Plaintiff in this matter. Without any further investigation of other leads, Smith was certain that he had solved his case – In his mind whoever had called that number had committed this crime.

47.     But this number was actually merely a misdial by Mr. Peseo himself made at a time when the perpetrators did not have access to his cell phone. Mr. Johnson's number is identical to that of the ex-girlfriend of Mr. Peseo, whom he called regularly – except for the last digit. This phone call lasted less than a minute. Immediately following this misdial, Mr. Peseo spent 27 minutes on the phone with T-mobile customer service. It should have been clear to Smith that it was highly improbable if not impossible that the perpetrators where the ones using Mr. Peseo's phone at that time. It should also have been clear from simply examining the phone records that this "lead" was just a "misdial."

48.     On October 4, 2005, on the basis of this single misdial, Smith placed Latisha's photo in a photo array and showed the array to Mr. Peseo while he was still at the hospital and heavily medicated post-surgery. It was at that point

that Smith obtained a false identification of Latisha from Mr. Peseo as one of the girls who had attacked him. This was the only purported "probable cause" to arrest Latisha.

49. Based on this improper, suggestive and incorrect photo identification, Smith issued and distributed an "i-card" to the N.Y.P.D. that Latisha was wanted for questioning.

## THE ARREST AND INTERROGATION OF LATISHA

50. On October 11, 2005, Latisha was cited by a transit officer for playing music too loudly on the subway and asked to get off the subway. When the office ran Latisha's identification, which she had given without hesitation or question, he saw that an i-card had been issued for Latisha indicating she was wanted for questioning. Smith was notified and he then responded to the transit division at the Union Square subway station. Latisha was immediately handcuffed and placed in a cell. She was not free to leave.

51. When Smith responded to transit division, before transferring her to the 44th precinct, he should have noticed that the physical description of Latisha did not in anyway match the description given to him by multiple witnesses of the female perpetrators of the crime.

52. Upon information and belief Smith and other N.Y.P.D. officers realized that the identification given by Mr. Peseo was so unreliable that they did not seek photo identifications from the other four witnesses, pre-arrest, in fear of obtaining exculpatory negative results.

53.     Latisha was taken to the 44th precinct by Detective Smith. It was at this
point Latisha asked to speak to her mother. This was the first time of many that
the defendant made this request which was ignored by the detectives.

54.     Three detectives interrogated Latisha over the next 24 hours. The
Dectectives denied Latisha any food for hours, kept screaming at her and
pressuring her, and calling her derogatory names such as "slut' and "whore"
and telling her that if she didn't confess and tell them the truth then she would
never see her son again as he would end up on foster care. As the arduous
and lengthy interrogation continued the Detectives falsely promised leniency,
falsely telling Latisha that she would be able to go home if she simply
confessed.

55.     After over 24 hours of being in custody and being denied the ability to
speak with or see her mother, Latisha was broken down. She had been
coerced, forced and defrauded into submission. Detectives drew up a
statement implicating Latisha and Malisha Blyden as the female perpetrators of
the crime.  They then read it back to Latisha, telling her to answer affirmatively
to what they had written and to sign the statement. They again lied and
promised that if she signed the statement she would be able to go home.

56.     After being in police custody for over 24 hours and before being
transferred to Rikers Island for the weekend, Detectives asked Latisha to
repeat her statement, filled with inconsistencies and details given to her by the
police to the Assistant District Attorney. By effectively giving Latisha a "script" of

what she needed to say, Latisha was able to provide details about the crime
which only would have been known by the perpetrators and the police.

57.     As the investigation continued closer to trial, more and more
inconsistencies in Latisha's police statement were revealed and in some cases
the statement was contradictory to the discovered evidence.

58.     Detectives then forced Latisha to pick the men out of a photo array who
had participated in the crime. They again had promised her leniency if she
agreed to pick out the men. In hopes of being released and sent home to her
mother, after over 24 hours in police custody, Plaintiff picked random men out
of the photo lineup as perpetrators of the crime.

59.     Latisha was then sent to Rikers Island for the weekend, where she was
held until Monday when she was arraigned. She was released a few days later
on her own recognizance but was subsequently remanded on April 23, 2007.
She remained incarcerated from that date until her subsequent release on
January 17, 2014.

## FURTHER INVESTIGATION

60.     During further investigation in 2005, Smith learned that one of the phone
numbers dialed from Mr. Peseo's cell phone belonged to Shermaine Maitland,
who was living in the Polo Ground Complex with the real perpetrators. Smith
went to her residence to speak with her but instead spoke with her father who
refused to answer any questions. Smith did not return or further attempt to
question Ms. Maitland until directed to do so by the Assistant District Attorney in

2007. At this point, Smith was fully aware that Ms. Maitland had been called twice from Mr. Peseo's phone *after* the shooting and from Mr. Nti's phone on the day before the shooting. He had done no further investigation of this obvious connection to the real perpetrators and instead was convinced, along with the other detectives, that Latisha was guilty he set out to extract a false confession from Latisha, thereby guaranteeing her continued arrest, detention and ultimate conviction.

61.    Later on, Detective Smith arrested Mr. Barnes, a man who was identified both by Latisha and by Mr. Peseo (via photo array) as being one of the perpetrators. However, it was quickly evident that Mr. Barnes could not have had anything to do with the crime because in September 2005 he was in a residential drug treatment facility.

62.    Instead of reevaluating why both Mr. Peseo and Latisha picked a man from a photo array who was clearly innocent, detectives and prosecutors simply ignored this major discrepancy in Latisha's statement and this major evidence of the unreliability of Peseo's identifications. .

63.    In January 2007, one year after Latisha had been arrested and interrogated, Detective Smith, at the explicit directive of the Assistant District Attorney interviewed Shermaine Maitland.

64.    During this interview, Detectives Smith and Mullarky learned that Maitland had been renting a room in a Harlem River Drive Apartment in the Polo Grounds. She explained that while she was living there, two girls named "Jackie" and "Latrise" who were prostitutes for Jonathan Cassanova were also

staying there. She further told the detectives that she was at the apartment when the robbery was planned against Mr. Peseo and that she saw Jackie and Latrise rehearse their roles in the robbery. Furthermore, she saw that the group had in their possession tape, rope and a gun. Maitland also informed the detectives that she was home when the group returned with a laptop, a TV and bags of clothing later that morning and identified all the men involved by name.

65.     Even though Maitland knew Jackie and Latrise, and did not know Latisha, Detective Smith reported that Maitland identified "Jackie" as the Plaintiff, Latisha Johnson.

66.     Detective Smith, falsely and maliciously and with indifference to the effect it would have on Latisha, wrote in a report that Maitland identified Latisha using the Photo Manager System. However, he later testified at a grand jury that the identification Ms. Maitland made of Latisha was not by array but by showing her a single photo of Latisha.

67.     After speaking with Maitland, Detectives met with Mario Nogueira, the man from whom Maitland rented the room, and who was later determined to be the getaway driver. He also told police about the real male perpetrators and named them all – Terrell Davis, Kashawn Rowson, Jonathan Cassanova, and Jeffrey Graves. He also described the two girls involved who he called "Jackie" and "Latrise".

68.     Mr. Nogueira also was aware of several facts about the crime which would only have been known by the perpetrators. Nogueira also said that he did not know Latisha though he subsequently identified Latisha at trial.

69.     Detectives Smith and Mullarkey reported that Nogueira identified Latisha
as "Jackie."

## THE TRIAL

70.     Prosecutors did not introduce either the written or videotaped statement of
Latisha at trial as upon information and belief they knew it was unreliable. They
should not have proceeded to trial as the unreliability of Latisha's statement
was patent and evident and the identifications of Plaintiff were wholly incredible
and unreliable.

71.     Latisha was tried before a jury in Supreme Court, Bronx County, beginning
May 7, 2007.

72.     The primary evidence offered against Latisha at her trial were the false
identifications obtained by the Detectives through unconstitutional and illegal
suggestion, coercion, fabrication or deceit.

73.     Latisha was convicted by jury on June 11, 2007 due to these false
identifications. She was sentenced to 40 years in prison.

## LATISHA'S EXONERATION

74.     After Latisha's conviction, the Bronx District Attorney's Office re-
interviewed numerous witnesses including Mario Nogueira and Shermaine
Maitland. All of them recanted their prior identifications of Latisha and identified
Latreese Shufford as the true "Lace."

75.     On January 14, 2014 the Bronx District Attorney's Office interviewed
Shufford. When they questioned her, she gave a full and detailed confession
about her role in the crimes.

76.   On January 16, 2014 the BXDA joined Plaintiff's application to vacate her

conviction and release her pursuant to N.Y. Crim. Proc. L §440.10(1)(g) and

(h).

77.   Finally, after spending nearly seven years in prison for a crime she did not

commit, Latisha Johnson was finally released from custody.

78.   On March 11, 2014, the BXDA moved to dismiss the indictment against

the Latisha removing from Latisha the specter, shame and burden of being

charged, tried and convicted of these heinous crimes.

## PLAINTIFF'S DAMAGES AND INJURIES

79.   Plaintiff's injuries and damages include, but are not limited to:

   a. Her false arrest and malicious prosecution and unjust conviction for

      attempted murder, burglary, robbery, assault, and criminal possession

      of a weapon, and sentence of 40 years in prison;

   b. Her loss of liberty for a total of 6.5 years, including the months before

      her conviction and the balance of time after that event;

   c. Past and future physical illnesses and injuries as a result of her

      wrongful conviction and her experiences in prison;

   d. Past and future mental and emotional injuries, pain and suffereing

   e. The loss of employment income, and diminution of future earning

      ability.

   f.  Loss of enjoyment of life;

   g. violation of her civil rights;

h.  shame and embarrassment;

i.  loss of support of her family and friends;

j.  loss of parental rights to her son Christian;

k.  l.  emotional distress, anxiety and fear.

### FIRST CAUSE OF ACTION

### Malicious Prosecution Under 42 U.S.C. §1983, 14TH and 4TH Amendments

80.  Plaintiff repeats and realleges each and every allegation contained in ¶ 1 through 79 of this Complaint.

81.  Defendants, with malice and without probable cause did arrest and aided in the prosecution of Plaintiff for attempted murder, burglary, robbery, assault, and criminal possession of a weapon, while all acting individually and in concert caused Plaintiff to be arrested and prosecuted for the aforementioned crimes, violating Plaintiff's constitutional rights.

82.  Defendants with malice and while acting individually and in concert, intentionally and knowingly misrepresented the truth and withheld exculpatory evidence from the grand jury.

83.  Defendant Detectives, specifically Smith and others, with malice, knew or should have known, with deliberate reckless indifference to the truth, that probable cause did not exist to arrest or prosecute Plaintiff due to, but not limited to the fact that Plaintiff's statements allegedly implicating her were not a product of her free will, and that evidence had been fabricated by the Defendants, and that Defendants did not disclose this or any exculpatory or impeachment evidence to the grand jury or prosecutors.

84.     Defendants arrested and prosecuted Plaintiff without probable cause, in
        violation of her constitutional rights with conduct no reasonable officer
        would have believed was lawful.

85.     The Defendant officers performed the above-described acts while acting
        under the color of state law, deliberately, intentionally and recklessly
        disregarding the truth and Plaintiff's rights with malice.

86.     Plaintiff is actually innocent of the crimes of attempted murder, burglary,
        robbery, assault and criminal possession of a weapon.

87.     Prosecution was terminated in Plaintiff's favor on March 11, 2014 by
        dismissal of the indictment with prejudice.

88.     Due to the Defendants' conduct, Plaintiff was maliciously prosecuted,
        wrongfully convicted and imprisoned for almost seven years and suffered
        other grievous and continuing damages and injuries set forth in ¶78 of this
        complaint.

89.     The Defendant City of New York is liable under the doctrine of *respondeat
        superior* for the actions of the named individuals.

90.     The individual defendants all acted under color of State law at the time of
        their actions.

91.     By reason of the foregoing, Plaintiff was damaged as described in
        paragraph 78 of this complaint and was otherwise damaged, all to her
        detriment in the sum of  FIFTY MILLION ($50,000,000.00) DOLLARS
        along with interest, cost and disbursements and such other and further
        relief as the court deems just and proper.

## SECOND CAUSE OF ACTION

### Violation of Plaintiff's Due Process Rights under 42 U.S.C. §1983, 14th and 4th Amendments

92.   Plaintiff repeats and realleges each and every allegation contained in ¶ 1 through 91 of this Complaint.

93.   Defendants, acting individually and in concert, failed to investigate evidence they knew or should have known, or through deliberate and reckless indifference, was exculpatory for Plaintiff's prosecution.

94.   These failures include, but are not limited to, failing to fully investigate the numbers dialed post-shooting of Mr. Peseo, and waiting to properly interview Maitland until directed to by the Assistant District Attorney.

95.   Plaintiff is actually innocent of the crimes of attempted murder, burglary, robbery, assault and criminal possession of a weapon.

96.   Even without probable cause, Plaintiff was held until arraignment and then remanded again in April 2007 until March 2014.

97.   Defendant Officers and Detectives, and their supervisors, failure to properly investigate and failure to investigate available exculpatory evidence deprived Plaintiff of her constitutional rights.

98.   Defendants did this without probable cause, in violation of her constitutional rights with conduct no reasonable officer would have believed was lawful.

99.   The Defendant officers performed the above-described acts while acting
      under the color of state law, deliberately, intentionally and recklessly
      disregarding the truth and Plaintiff's rights with malice.

100.  Defendants coerced and induced Plaintiff to falsely confess to the crime.

101.  Defendants proceeded with the arrest and prosecution of the Plaintiff even
      though they knew that they had no probable cause and insufficient
      credible and reliable evidence with which to obtain a conviction.

102.  Due to the Defendants' conduct, Plaintiff was maliciously prosecuted,
      wrongfully convicted and imprisoned for almost seven years and suffered
      other grievous and continuing damages and injuries set forth in ¶78 of this
      complaint.

103.  Defendant City of New York is liable under the doctrine of *respondeat
      superior* for the actions of the named individuals.

104.  The individual defendants all acted under color of State law at the time of
      their actions.

105.  By reason of the foregoing, Plaintiff was damaged as described in
      paragraph 78 of this complaint and was otherwise damaged, all to her
      detriment in the sum of  FIFTY MILLION ($50,000,000.00) DOLLARS
      along with interest, cost and disbursements and such other and further
      relief as the court deems just and proper.

### THIRD CAUSE OF ACTION

### Claims under 42 U.S.C. §1983 Civil Rights Conspiracy

106.  Plaintiff repeats and realleges each and every allegation contained in ¶ 1 through 105 of this Complaint.

107.  Defendant Detectives and Officers, acting within the scope of their employment and under the color of law, agreed amongst themselves and with others to act in concert in order to deprive the Plaintiff of her constitutional rights.

108.  Defendants, in furtherance of the conspiracy engaged in conduct, but not limited to, the misrepresentation of false identifications of the Plaintiff and withholding of exculpatory evidence from the grand jury and prosecutor.

109.  Due to the Defendants' conduct, Plaintiff was maliciously prosecuted, wrongfully convicted and imprisoned for almost seven years and suffered other grievous and continuing damages and injuries set forth in ¶78 of this complaint.

110.  Defendant CITY OF NEW YORK is liable under the doctrine of *respondeat superior* for the actions of the named individuals.

111.  The individual defendants all acted under color of State law at the time of their actions.

112.  By reason of the foregoing, Plaintiff was damaged as described in
paragraph 78 of this complaint and was otherwise damaged, all to her
detriment in the sum of  FIFTY MILLION ($50,000,000.00) DOLLARS
along with interest, cost and disbursements and such other and further
relief as the court deems just and proper.

## FOURTH CAUSE OF ACTION

### *Monell* claim against City of New York *under 42 U.S.C. §1983*

113.  Plaintiff repeats and realleges each and every allegation contained in ¶ 1
through 112 of this Complaint.

114.  Prior to Plaintiff's arrest, policymaking officials at the NYPD, with
deliberate indifference to the constitutional rights of individuals suspected
or accused of criminal activity, to the risk of arresting, prosecuting and
convicting innocent people, and to the right of all criminal suspects and
defendants to due process and a fair trial, implemented plainly inadequate
policies, procedures, regulations, practices, customs, training, supervision,
and discipline concerning:

i.   The use of excessive promises of rewards and unduly coercive
     interrogation techniques with vulnerable defendants and
     potential witnesses, including drug users and addicts, drug
     dealers, and/or individuals fearing prosecution and
     imprisonment for their own criminal behavior;

ii.  The determination of probable case to make an arrest; and

iii. The continuing duty of police investigators to preserve and to
     make timely disclosure to the District Attorney, during criminal
     investigations and prosecutions, of all material evidence or
     information ("Brady Material") favorable to a person suspected,
     accused or convicted of criminal conduct, including, but not
     limited to, evidence of innocence, evidence that an identifying or

> prosecution witness is unreliable or lacks general credibility, so
> that the District Attorney could comply with his constitutional
> obligation to disclose such information to the defense under
> *Brady*.

115. With respect to "i" and "iii" in the preceding paragraph, as established by
deposition testimony obtained from present and former police detectives,
including supervisors, during several civil rights lawsuits, including *Zahrey*
*v. City of New York, et al.*, 98 Civ. 4546 (DLP) (S.D.N.Y.), prior to and
during 1995, the NYPD provided no training concerning appropriate
interrogation and *Brady* compliance.

116. Upon information and belief, at the time that the defendant detectives
were hired and committed these acts, the NYPD had no set, organized
training procedures in place.

117. The aforesaid deliberate or *de facto* policies, procedures, regulations,
practices and/or customs (including the failure to properly instruct, train,
supervise and/oor discipline employees with regard thereto) were
implemented or tolerated by policymaking officials for the Defendant City
of New York, including but not limited to, the New York City Police
Commissioner, who knew (or should have known);

    i.  To a moral certainty that such policies, procedures, regulations,
       practices and/or customs concern issues that regularly arise in
       the investigation and prosecution of criminal cases;

    ii.  That such issues either present police employees with difficult
       choices of the sort that instruction, training and/or supervision
       will make less difficult or that the need for further instruction,
       training, supervision and/or discipline was demonstrated by a
       history of police employees mishandling such situations as well
       as the incentives that police employees have to make the wrong
       choice; and

iii. That the wrong choice by such employees concerning such issues will frequently cause the deprivation of the constitutional rights of criminal suspects or defendants and cause them constitutional injury

118. The aforementioned policymaking officials had the knowledge and the notice alleged in the proceeding paragraph based upon, among other circumstances:

i. Credible allegations, many substantiated by judicial decisions finding, that NYPD officers had wrongfully withheld material evidence or knowingly given false or misleading testimony, including *Zahrey v. City of New York*, 2009 WL 54495 *10 (S.D.N.Y. Jan 7, 2009)(denying summary judgment to officers in NYPD's internal affairs Bureau who were alleged to have used coercive tactics to secure inculpatory testimony of "at best…questionable veracity."

ii. Civil lawsuits, some of which resulted in substantial civil settlements, credibly alleging that police had falsified, exaggerated, or withheld material evidence, or conducted searches or arrests without probable cause, including *Gurley v. City of New York*, 95 Civ. 2422 (E.D.N.Y.)(NYPD failed to investigate the officer who suppressed from the prosecution a ballistic report; case settled in 1997 for $1.75 million).

iii. Numerous decisions of the United States Supreme Court, the United States Court of Appeals for the Second Circuit, the New York Court of Appeals, and the New York Appellate Division, discussing the difficult issues that regularly arise under *Brady* as well as the probably cause requirement of the Fourth Amendment;

iv. Judicial decisions directly criticizing the NYPD for failing to train and supervise officers in their *Brady* obligations and for failing to adopt adequate *Brady* disclosure policies, *see Carter v. Harrison*, 612 F. Supp. 749 (E.D.N.Y. 1985)(McLaughlin, D.J., adopting the Report and recommendation of then magistrate judge Shira A. Scheindlin), and putting NYPD on notice that the City could be held liable for its failure to adequately train police officers and investigators regarding their obligations to provide truthful testimony and to disclose evidence that favors criminal defendants under *Brady*, *see Walker v. City of New York*, 974 F.2d 293 (2d Cir. 1992), and *Carter v. Harrison*, *supra*;

    v.   Formal reports of the N.Y.C. Comptroller's Office and the Bar Association of the City of New York criticizing the NYPD and the NYC Law Department for failing to follow up substantial civil settlements for police misconduct with disciplinary or other remedial action;

    vi.   The inherent obviousness of the need to train, supervise and discipline police officers in such obligations to counteract the pressure on officers and the powerful incentives they have to close cases and to obtain arrests and convictions;

    vii.   The Mollen Commission Report finding police perjury and filing of false police reports was endemic in the department. That's based on *Collins v. City of New York*, 923 F. Supp.2d 462, 479 (E.D.N.Y. 2013) ("The Mollen Report, however, establishes – at least for present purposes – that the misconduct underlying this case and *Zahrey* was sufficiently widespread to support an inference of deliberate indifference. An entire section of the Report is devoted to 'Perjury and Falsifying Documents' which is described as a 'serious problem facing the department.'" *Mollen Report* at 36).

119.   Under the principals of municipal liability for federal civil rights violations, the City's Police Commissioner (or his authorized delegates), has final responsibility for training, instructing, supervising and disciplining police personnel with respect to the investigation and prosecution of criminal matters, including Constitutional requirements governing the interrogation of witnesses, the initiation of criminal prosecutions, and the disclosure of *Brady* material.

120.   The Police Commissioner, personally and/or through his authorized delegates at all relevant times had final authority, and constitutes a City policymaker for whom the City is liable, with respect to compliance by NYPD employees with the above-mentioned constitutional requirements.

121.   During all times material to this Complaint, the Police Commissioner owed
       a duty to the public at large and to the Plaintiff, which he knowingly and
       intentionally breached, or to which he was deliberately indifferent, to
       implement policies, procedures, customs, practices, training and discipline
       sufficient to prevent or deter conduct by his subordinates violating the
       aforementioned constitutional rights of criminal suspects or defendants
       and of other members of the public.

122.   The aforesaid policies, procedures, regulations, practices and/or customs
       of Defendant City and the NYPD were collectively and individually a
       substantial factor in bringing about the aforesaid violations by the
       Individual Police Defendants of Plaintiff's rights under the Constitution and
       laws of the United States.

123.   By virtue of the foregoing, Defendant City of New York is liable for having
       substantially caused the foregoing violations of Plaintiff's constitutional
       rights and his constitutional injuries.

### FIFTH CAUSE OF ACTION

#### *Failure to Intercede under 42 U.S.C. §1983*

124.   Plaintiff repeats and realleges each and every allegation contained in ¶ 1
       through 123 of this Complaint.

125.   Defendants acting toward Plaintiff under color of the law statutes,
       ordinances, customs, and usage of the State of New York and the City of
       New York, and acted within the scope of their employment had a multitude
       of opportunities to intercede on behalf of the Plaintiff and to prevent the

violation of her constitutional rights, but declined or refused to do so.
These refusals were a direct violation against Plaintiff's Fifth Amendment
Rights against self-incrimination and Due Process.

126. No reasonable prosecutor, officer, detective, or supervisor would have
believed that these refusals and failures to intercede were lawful.

127. Due to the Defendants' conduct, Plaintiff was maliciously prosecuted,
wrongfully convicted and imprisoned for almost seven years and suffered
other grievous and continuing damages and injuries set forth in ¶78 of this
complaint.

128. Defendant CITY OF NEW YORK is liable under the doctrine of *respondeat
superior* for the actions of the named individuals.

129. The individual defendants all acted under color of State law at the time of
their actions.

130. By reason of the foregoing, Plaintiff was damaged as described in
paragraph 78 of this complaint and was otherwise damaged, all to her
detriment in the sum of FIFTY MILLION ($50,000,000.00) DOLLARS
along with interest, cost and disbursements and such other and further
relief as the court deems just and proper.

## SIXTH CAUSE OF ACTION

### False Arrest and Malicious Prosecution Under State Law

131. Plaintiff repeats and realleges each and every allegation contained in ¶ 1
through 130 of this Complaint.

132. By virtue of the foregoing, the Individual Defendants, acting in concert with each other and with additional persons for whose acts they are liable, initiated, continued, and/or caused the initiation or continuation of, criminal proceedings against Plaintiff.

133. Plaintiff's arrest and custody was without probable cause.

134. Notwithstanding the obtaining of an indictment in this matter, the arrest and prosecution was void from the out set as the defendants had no probable cause to arrest and detain Plaintiff.

135. The obtained indictment was tainted by the presentation of false, misleading and incomplete evidence as well as by the withholding of exculpatory evidence.

136. The criminal proceedings terminated in Plaintiff's favor.

137. There was no probable cause for the commencement or for the continuation of the criminal proceedings, yet the defendants continued the prosecution of the Plaintiff.

138. The Defendants acted with actual knowledge of the baselessness of the prosecution and acted with actual malice. Alternatively, the defendants acted with deliberate and reckless indifference to the truth.

139. The Defendant City of New York is liable under the principle of *respondeat superior* for the actions of the named individuals.

140. The individual defendants all acted under color of State law at the time of their actions.

141.   By reason of the foregoing, Plaintiff was damaged as described in
       paragraph 78 of this complaint and was otherwise damaged, all to her
       detriment in the sum of  FIFTY MILLION ($50,000,000.00) DOLLARS
       along with interest, cost and disbursements and such other and further
       relief as the court deems just and proper.

## SEVENTH CAUSE OF ACTION

### Infliction of Emotional Distress Under State Law

142.   Plaintiff repeats and realleges each and every allegation contained in ¶ 1
       through 141 of this Complaint.

143.   Defendants engaged in a continuous pattern of extreme and outrageous
       conduct directed at Plaintiff at least until her release from prison in
       January 2014.

144.   Defendants engaged in that pattern of conduct with intention to cause or in
       reckless disregard of the substantial probability that it would cause,
       Plaintiff severe emotional distress.

145.   Specifically, defendants, individually, in concert with, conspiring with,
       and/or aiding and abetting one another and other persons for whose acts
       they are liable, while acting in an investigative or administrative capacity,
       coerced Plaintiff to falsely confess to the crime; coerced witnesses into
       making false identifications to be used against Plaintiff; created false
       official records to be used against Plaintiff; caused the detainer and
       imprisonment of Plaintiff which resulted in the loss of Plaintiff's parental
       rights to her son Christian, and through their intimidation, duress,

coercion, unreasonable deception, arrest and unconstitutional
interrogation intentionally inflicted emotional distress upon the Plaintiff.

146. Plaintiff suffered severe emotional distress as a result of, and that was
proximately caused by, the Defendants' aforementioned actions.

147. By virtue of the foregoing, Plaintiff suffered the actual damages identified
in ¶78.

148. Defendant City of New York is liable under the principle of *respondeat
superior* for the actions of the individuals.

149. The individuals acted under color of State law at the time of their actions.

150. By reason of the foregoing, Plaintiff was damaged as described in
paragraph 78 of this complaint and was otherwise damaged, all to her
detriment in the sum of FIFTY MILLION ($50,000,000.00) DOLLARS
along with interest, cost and disbursements and such other and further
relief as the court deems just and proper.

### EIGHTH CAUSE OF ACTION

**Negligent Hiring, Training and Supervision under State law**

**City of Canton v. Harris and 42 U.S.C. §1983**

151. Plaintiff repeats and realleges each and every allegation contained in ¶ 1
through 150 of this Complaint.

152. Defendant Supervisors,  acting toward Plaintiff under color of the law
statutes, ordinances, customs, and usage of the State of New York and
the City of New York, and acted within the scope of their employment
knew or should have known that their subordinate officers had deprived

Plaintiff of her constitutional rights through their subordinates gross misconduct that included but not limited to: coercing and causing a false confession, deliberately ignoring exculpatory evidence in violation of *Brady*, failing to properly investigate, causing deliberate false identifications of the Plaintiff in violation of her Due Process Rights, and their ongoing affirmative duty to come forward with evidence of innocence and the truth of their illegal misconduct.

153. Defendant Supervisors, by failing to supervise their subordinate officers and by their active participation in the facilitation of this conduct deprived Plaintiff of her constitutional right against self-incrimination.

154. Defendant Supervisors permitted their subordinates to act with license as they wished without proper supervision, discipline or training, and in an environment which their subordinates knew that their violations of Plaintiff's constitutional rights would be facilitated, approved and/or condoned by their supervisors.

155. Defendant Supervisors acted in a way which no reasonable supervisor would believe were lawful.

156. Due to the Supervisor Defendants' conduct, Plaintiff was maliciously prosecuted, wrongfully convicted and imprisoned for almost seven years and suffered other grievous and continuing damages and injuries set forth in ¶78 of this complaint.

157. Defendants CITY and BXDA failed to properly, hire, train and supervise their employees in general and those specifically involved with Plaintiff's

case; failed to take proper steps to insure that its employees were aware
of citizens' and the Plaintiff's Constitutional rights; aware of their
obligations under the Constitutions of the United States and the State of
New York; failed to properly train and supervise their employees in the
handling of exculpatory evidence; ; failed to properly train and supervise
their employees in the taking of confessions; ; failed to properly train and
supervise their employees in the securing and pursuit of evidence; and
failed to properly train and supervise their employees in proper and legal
police procedure.

158.   By reason of the foregoing, Plaintiff was damaged as described in
paragraph 78 of this complaint and was otherwise damaged, all to her
detriment in the sum of  FIFTY MILLION ($50,000,000.00) DOLLARS
along with interest, cost and disbursements and such other and further
relief as the court deems just and proper.

## DAMAGES DEMANDED

WHEREFORE, Plaintiff demands judgment against the Defendants as follows:

a. For compensatory damages of FIFTY MILLION ($50,000,000.00)
DOLLARS;

b. For punitive damages against the individual Defendants;

c. For reasonable attorneys' fees, together with the costs and
disbursements pursuant to 42 U.S.C. §1988 and to the inherent powers of this
Court;

d. For pre-judgment interest, costs and disbursements as allowed by law;

e. For such other and further relief as this Court may deem just and

proper.

Dated: July 6, 2015

Mineola, New York

CUOMO LLC
Attorneys for Plaintiff

By: Oscar Michelen(OM 5199)
200 Old Country Road
Mineola, New York 11501
(516) 741-3222